The only issue in this case is whether the language of IBM's general release and covenant not to sue complies with the unique and stringent requirements established by the Older Workers Benefit Protection Act. That issue has already been decided in the negative by the 8th Circuit Court of Appeals in Tomford v. IBM, which considered a waiver which was materially identical to the language of the waiver before the Court this morning. The 8th Circuit stated, because the release of claims signed by Tomford as part of IBM's involuntary termination program did not satisfy the statutory waiver requirements of the Older Workers Benefit Protection Act, we reversed. Counsel, would you consider that to have been a factual finding or a legal holding? I would consider that to be a legal finding, Your Honor. There are three reasons that I would say that, Your Honor. First of all, if you look at the language of the Tomford decision, it says in no less than four places it discusses the language of the Tomford decision. Secondly, Your Honor, it discusses the language of the waiver in four different places in the Tomford decision and goes through the language and compares it to the requirements of the OWBPA. The only factual issue that is different or remotely distinguishable from our case in Tomford to this case is that Mr. Tomford asked for an explanation of the waiver and IBM did not give it to him. However, we think that's an independent fact. It's a distinction without a difference. The reason that we would contend that, Your Honor, is that what IBM told Mr. Tomford in response to the question is that the wording is as intended. So in other words, it told him, go back and look at the language of the statute. Secondly, go back and look at the language of the waiver. Excuse me. Secondly, the waiver language itself says you have not relied on any representations, promises, or agreements of any kind, whether written or oral, made to you in connection with your voluntary decision to accept the terms of the severance package. So the waiver language itself omits that. And finally, and most importantly, Your Honors, what I would say is that the primary requirement, the first requirement of the OWBPA is that the language of the waiver, at a minimum, must be written in a manner calculated to be understood by such individual or by the average individual eligible to participate. I want to ask you about, because you're asking to apply issue preclusion, essentially. And if in the other case, there was one plaintiff, and here you have more plaintiffs, correct? Correct, Your Honor. And it's not a certified class, is that correct? That's correct. It's a putative class or something along those lines. It's a putative class, but I was... Well, but let me just frame where my concern is here. That obviously, when you go through the elements of whether you're going to apply that, is the one person class different than, or the one person different than who we're talking about here? I mean, who was that one person? Say, let's say the one person in the other case was a janitor. And let's say the people in your class are all middle managers. And would that make a difference in terms of, you know, and I'm not trying to be, you know, put social in terms of, would there be a difference in how you could write the language and expect it to be understandable depending on, say, the education levels of the individuals? The record here, Your Honor, does reflect that one of the individuals is in fact a janitor. But in response to your question, I would say this, Your Honor, that the OWBPA focuses on mass reductions in force. And you have to look at the average individual eligible to participate. Well, but let's just say all your people, let's say your people were upper management people. And that to be an upper management person, you had to have a college degree, and you had to have a certain amount of experience. And say that the other individual was a person that maybe had a high school diploma or maybe even didn't graduate from high school. I would think that in looking at the language, that might be a factor. Your Honor, two things. One, although we did raise the issue of issue preclusion, I would suggest to this court that although that is something that's available, my understanding of the case law is that that is at the discretion of the trial court. It's been almost two years since we filed this appeal before we got here. And I would suggest that the court decide this case on the merits of the language. In response to the question that you just asked, Your Honor, our contention is that no individual, regardless of his or her level of education or background, would be able to understand the language of IVM's waiver. There really are four problems with that language, Your Honor. Well, let me ask you this. Obviously, the law contemplates that you could write a waiver in a way that people could understand it. I really can never, you know, that's the thing. I figure, you know, it has to go to my level. But so what could they have said that would have made this understandable? I don't think it's our burden, Your Honor, to write language for the company. But what I would suggest to you, Your Honor, first of all, is that they not use in the same document both a release and a covenant not to sue. A covenant not to sue is a legal term of art. The Eighth Circuit characterized it as being fairly amorphous. And I would suggest to you that the average person on the street, regardless of his or her level of education, is not familiar with the term covenant not to sue. And how then could IVM protect its rights in that regard if it's precluded from including within the document the covenant that it feels is really important to its interest? Your Honor, there is language that we attached to our reply brief. It's Appendix Pages 1 to 8. That is sample language that was taken from the BNA text on age discrimination. The chapter of which, by happenstance, was written by Mr. Lowell's partner. And that language does not use the term covenant not to sue. I'm not necessarily endorsing that language, but it's written in a much clearer fashion than this language. All I'm saying is that if you do sue us on these causes of action, we will, you can be liable for attorney's fees and damages. That's what they were trying to get at. What they were trying to get at was that you could still challenge the validity of the release, but if you did, you would not be liable. Yes, Your Honor. I don't understand how, that's with regards to the ADEA, but more broadly, with respect to the causes of action they were trying to cover, the reason they wanted to add this was to get attorney's fees and damages from the lawsuit, which they just could have done directly. I don't understand, although I don't understand you to be raising this, why even the main part of the waiver, the release, doesn't literally preclude challenging the waiver agreement. I mean, isn't the waiver provisions, the Older Workers Act, part of the ADEA, and therefore, if you're releasing your claims into the ADEA, why aren't you releasing the right to challenge the waiver? I'm not sure that I fully understand your question, Your Honor. Why isn't the release itself essentially impermissible for appearing to require or to release any claim with regards to the validity of the waiver? You can release in the waiver. I understand you can. I'm asking how they did that, because what they said was that the release covers claims arising from the Age Discrimination and Employment Act. Isn't this a claim arising from the Age Discrimination and Employment Act, a claim that the waiver is invalid? It is, Your Honor, but then what they do in the second paragraph under the covenant not to sue, first of all, they've conflated the two terms, general release and covenant not to sue, into a single term release, which means that to the average individual, he or she can read those terms as functionally interchangeable. That was one of the findings of the Eighth Circuit in the Tomford decision. So when you get into the language of the covenant not to sue, where it says this release does not, or this covenant not to sue, does not apply to actions, what the individual not understanding what a covenant not to sue is, having had the terms defined as being functionally interchangeable, what they're reading it as, I gave up my claim earlier, but now here's an exception. It says that I can still file suit under the OWBPA. And that problem is increased, Your Honor, by the sentence which immediately follows that. The next sentence says, instead of saying that the employee can't sue IBM, or simply that you can't sue except for challenging the validity of the lease, it says if you accept severance pay, if you sue IBM, and then it goes on from there. So it suggests that you can still sue IBM. I'm saying that it has to be, it has to mean that, because the release itself would release the claims on the agreement. And if they are meaning to preserve the claims on the agreement, then they have to be negating the release in general, not just the damages and the attorney's fees, right? With respect, Your Honor, the And so I'm saying it's even more confusing than you're suggesting. So I would simply say it's highly confusing to the lay individual, and that's what you have to look at. Was it written in a manner calculated to be understood by the lay individual? Thank you, Your Honor. Thank you. Good morning. May it please the Court. Jeffrey Wolf for defendant IBM. I think I heard Mr. Young say he's withdrawing the issue of issue preclusion. I don't understand him to be saying that, but I do think that your time is probably better spent on the merits. I appreciate that, Your Honor. Let me address your point, Judge Berzon. The OWBPA does not confer a substantive right for relief such that you'd have a claim under the OWBPA, which then purportedly is being waived. The OWBPA is part of the ADEA, which governs when a release of ADA claims is permissible. The release portion of the IBM release, which was upheld by the Tarford Court as presenting no problems under OWBPA, simply says you're releasing IBM from any liability under the ADEA. It does not in any way say you can't challenge the release. The covenant not to sue is a separate part of the agreement, which, as I think you've correctly observed, provides for a remedy if the employee breaches the promise not to sue by awarding attorney's fees or other damages. The EEOC, in its post-OOBRE regulation, said that you can't penalize an employee for challenging an age waiver by saying you'll be liable for attorney's fees. So therefore, IBM, trying to preserve its right to be made whole if someone were to breach the covenant to sue by suing on release claims, while at the same time not running afoul of these regulations, said we're going to carve out an ADEA suit. Now, Mr. Young says the agreement says The ADEA suit that you carved out, though, is not necessarily one that has a waiver in it, right? I'm sorry, Your Honor. The ADEA suit that you carved out isn't necessarily one concerning the waiver. It's the whole ADEA suit that you carved out. Well, no, no. It would – well, you would not be able to successfully prosecute an ADEA suit unless you successfully challenged the waiver. Mr. Young's reference that the covenant not to sue says you may sue or the waiver doesn't really apply here, the words simply do not support that. The words simply say, if you sue on any of these release claims, you'll be liable for attorney's fees to IBM. But if you were to sue under the ADEA, then you won't be liable for attorney's fees. And that's all it says. It doesn't say you may. It doesn't say that we expect you to. It doesn't say the waiver you've just given us previously doesn't mean anything. It's simply saying, if you were to go ahead and sue contrary to your release, then you won't be held liable for attorney's fees. One question is, isn't this actually in misuse of the term covenant not to sue? Doesn't covenant not to sue ordinarily mean a – if you have not released your claims, if you have a right, but you agree not to sue on them? In other words, once you've substantively waived your rights, I don't think that in a technical legal sense, the covenant not to sue makes any sense or exists. The covenant not to sue is a covenant not to sue about something that you have a right to. I agree that even though I haven't given up my right, I agree not to sue on it. That's what the Blackstone statement that you keep quoting says. Well, Your Honor, I would disagree. The difference is a release is purely a defense. So if plaintiff sues, you raise the release of the release. That's not my understanding of the classic meaning of the term. Covenant not to sue means you're undertaking an independent contractual obligation that if you sue on a claim that's been released or sue on any claim, then you'll be liable for contractual damages. And the law is you don't get attorney's fees if you simply have signed a release. Or I should say the defendant doesn't get attorney's fees if the plaintiff simply signed a release. It's merely defensive. The defendant would still be out. It's attorney's fees. The law is – The idea is that all you needed to say in answer to the questions that were raised earlier is without using the term covenant not to sue is – And if you sue us, you can be liable for attorney's fees. That's all you needed to say, right? There were different ways of saying this, but that doesn't mean that the way IBM said it was confusing. May I remind the Court that you have the EEOC, which is charged with enforcing the ADA and OWBPA, say – Well, clearly what she said is less confusing. But, you know, what you're saying as a matter of law, yours isn't confusing. But wouldn't you agree if you sue us, you could be liable for attorney's fees? Is easier to understand than what you've just spent five minutes explaining? I think the waiver does – I think the release does say that. The release does say if you sue IBM on any of these release claims, you'll be liable for attorney's fees. It says if you violate this covenant not to sue by suing IBM or those associated with IBM, you will agree that you will pay all costs and expenses. Well, somebody has to know what it means to violate their covenant not to sue. With the covenant not to sue saying that you will not sue IBM on any of these release claims. I think if we all got together and brainstormed, I'm sure there's always going to be a different way we could express things. But hindsight is always 20-20, and that's not the standard under the OWBPA. It's supposed to be calculated in a manner to be understandable by the average participant or the person who is signing the release. And by the way, although I appreciate your admonition, let's not get back into issue preclusion, the Tomford case, even if you viewed it as possibly persuasive precedent, was rife with specific citations to allegations by Mr. Tomford that when he got it, he didn't understand it, that he asked IBM for clarification, they wouldn't give it to him. He then talks to his own lawyer, and after talking to his lawyer, he thinks it means he can go ahead and sue IBM on the ADA. And what... Before you digressed with our assistance, you were talking about the EEOC finding. Would you elaborate on that a little and what weight that's entitled to? Well, I think it is certainly entitled to weight. I can't quantify exactly how much weight, but the EEOC is the agency charged with enforcing the ADA, OWBPA. When Mr. Syverson went to the EEOC with his charge of age discrimination, they said, wait a minute, you signed this release, and this release bars your claim, and this release is valid under the OWBPA, so therefore we reject your charge. And that's in the record, and there's no dispute about that. And then, of course, we have the district court in Tomford, the district court in Syverson. They all agree with that. To be sure, Tomford disagrees. The Eighth Circuit disagrees. We acknowledge that, of course. But the Tomford case is rife with specific factual allegations, which led the court to then say, and I think this is the key ruling in the case, that given the lack of clarity in the agreement and, not or, not an independent ground, but and IBM's declination to tell Tomford what it meant by the language, we hold the agreement is not written in a manner calculated to be understood by the intended participants as required by OWBPA. This is a putative collective or class action in which they cannot make any specific individual allegations because that will be contrary to the collective action theory. They want to treat everybody the same. So they're attacking this solely on the face of the complaint, of the release. The Tomford Eighth Circuit decision had all this factual allegations, which, by the way, IBM never had a chance to rebut because it was summary judgment, which are simply not present here. There is no allegation in that complaint that Mr. Syverson or any of these other nine named plaintiffs or, for that matter, any of the thousands of employees across the country they're trying to sue on behalf, none of them had a specific misunderstanding or had asked for clarification. But the standard is an objective legal standard, is it not? Well, that is one of two different standards under 626F1A. So either it has to be written in a manner calculated to be understood by the individual, which means it's going to be a subjective standard, or it could be objective, calculated to be understood by the average individual. But how does the question of whether or not he actually understood have anything to do with that? I would say whether he actually understood is, of course, extremely germane to the first part. As to the second part, it would depend, therefore, on whether there would be additional proof that the average individual would have understood. No. Even as to the individual, the question of whether the individual actually understood it is not the question. The question is whether it was calculated for this individual to understand it. Well, I would submit if the individual actually understood it, that's pretty good proof that it was calculated to be understood by that individual. I think Thompert, the notion was that he didn't actually understand it. I don't know. Why was that relevant to the legal standard? Well, it was relevant to the Eighth Circuit because they cite it constantly, and they make that part of the decision. Occasionally. Thompert? Well, but, Your Honor, Thompert was saying, I don't understand this. I need clarification. And in footnote one of the opinion, the Eighth Circuit says it's axiomatic. If an agreement requires clarification, well, then it's obviously not understandable. And that doesn't apply with OBEPA. Those are specific factual allegations which are not in this case. Pew to collective action, 1236 motion. See if I understand your argument. Are you saying that there are two different mechanisms for determining whether or not there's been a violation? And you're saying that the Thompert case went under the individual prong, whether or not the individual actually or was calculated to understand. And you're saying this is a different prong whether the average person could. And therefore, Thompert isn't really persuasive for this case. Is that your argument? There are clearly two different standards. The employer can meet the burden under either the subjective, understandable to the individual, or the objective, understandable to the average participant. The problem with the Thompert Eighth Circuit opinion is we're not sure. Because they kind of say both. There's parts of the opinion that says, we don't think this is very clear language. But then there's also parts that says, Thompert says he didn't understand it. He asked for clarification. They wouldn't give it to him. He had an alternative understanding. And then there's that ultimate ruling I just read to you. I don't think we can sit here today and say, well, the Eighth Circuit was really evaluating just the second strand rather than the first strand. We don't know. It mushes the two together. That's why it's not issue of preclusion, because it's not the same issue. It's not a final judgment in that regard. But it's also, I don't think, persuasive to this court, because you're not dealing with those individual specific facts. This is a pure up or down, either the agreement as written complies or it doesn't comply. If we're right and it does comply, case over. If we're wrong, then we would move on to these other arguments that I've elaborated on. The past bulk of the Thompert decision is a discussion, in general, of the phraseology and of why, given the lack of clarity in the agreement, it was not written in a manner that could be understood by the intended participants. And there's a mention at the end about the fact that they didn't tell him, and maybe one other time, but that's about it. I mean, the overall discussion is not about Thompert in particular. Your Honor, I would respectfully disagree. There's both in there. I'm not saying that the discussion, the general language, isn't there, but the key part of the ruling is what I read, given the lack of clarity in the agreement and IBM's declination to tell Thompert what it meant by the language. You can't ignore that that's there and it's connected with an and, not an or. I can't read the ---- Obviously, if they had clarified it, then it would have been clarified, and then you wouldn't have had this problem. The reason why the lack of clarity is relevant is because it simply demonstrates that they didn't give him anything more clear than this unclear statement. I think a fair reading of the opinion is that they were persuaded by Thompert's allegation that he did not understand it, and if he didn't understand it, then that must mean it wasn't written in a way to be clear. Your Honors, I also believe that if you simply go through the agreement itself and get away from the rather tortured construction I submit the Eighth Circuit engaged in, it is, in fact, very clear, it's very understandable. I believe we've met our standard under OBEPA, and therefore, we respectfully ask that you affirm the judgment. Thank you very much. Thank you very much for your time. Thank you, counsel. The case of Syverson v. IBM is submitted. I believe you are out of time. Am I wrong? I thought I had you for a few minutes. I think you are in a negative. You are in the red. Thank you very much.
judges: Berzon, Rawlinson, Callahan